# CHARLESTON.

HARTIGAN v. BOARD OF REGENTS OF WEST VIRGINIA UNIVERSITY.

Decided March 9, 1901.

1. COURT'S JURISDICTION—*Board of Regents.*
    A court has no jurisdiction to review the action of the Board of Regents of the West Virginia University removing a professor. (By Judges Poffenbarger and Brannon.) (p. 15).

2. PROHIBITION—*Board of Regents.*
    A writ of prohibition does not lie to prevent the Board of Regents of the West Virginia University from executing a resolution of that board removing a professor. (By a Majority of the Court.) (p. 18).

3. PUBLIC OFFICE—*School Professor.*
    A professor in the West Virginia University is not a public officer. (By a Majority of the Court.) (pp. 19, 20).

4. PROFESSOR'S REMOVAL.
    Removal of officers discussed. (p. 21).

5. Board of Regents—*Notice of Action.*

    Notice and hearing are not required of a proceeding by the Board of Regents of the West Virginia University for the removal of a professor. (By Judges Poffenbarger and Brannon.) (p. 25).

Application of J. W. Hartigan for a writ of prohibition against George C. Sturgiss and others.

*Writ Denied.*

W. W. Arnett, W. R. D. Dent and Frazier & Frazier, for petitioner.

Mollohan, McClintic & Mathews and John A. Campbell, for respondents.

Brannon, President:

The Board of Regents of the West Virginia University removed Doctor James W. Hartigan from the professorship of anatomy in that institution, and he asks this Court for a writ of prohibition against George C. Sturgiss, R. R. McMahon, John A. Campbell, James L. Hamill, Albert H. Kunst, W. E. Powell, P. C. Eastham, James F. Brown and John J. Davis, individually and collectively as a Board of Regents, to prohibit them from carrying into execution the resolution of removal. Doctor Hartigan contests the validity of the action of the regents on several grounds, the chief ground being the want of notice to Doctor Hartigan of the proceeding to remove him, so that he might make defense, from which want of notice the act of removal is claimed to be void.

A question of gravity and public importance at once confronts us in the decision of this case. Has this Court, or any court, jurisdiction to review or reverse the action of the regents in this matter? Is the action of the Board of Regents subject to judicial review? The State is charged, and has assumed, the high duty of popular education, and in the performance of this duty it has set up an organism and endowed it with corporate life under the name of The West Virginia University. Though a corporation, it is not a private one created for private ends, but it is a public corporation, a branch of the State government, an instrumentality which the State has brought into being to aid it in carrying out this duty of educating the people. It is an arm of the State government, a part of it. It belongs to that one of

the three departments of the State government called the executive department. Though it is under the unrestricted control of the legislature, and supported by its appropriation of public money, because it performs public functions, yet the university is a branch of the executive department. But though the university is a branch of the State government executing public ends, still it is a separate corporate existence, managing its own affairs under statutory law, subject only to legislative regulation. It has its governing body, the regents appointed by the governor with the assent of the senate. Under chapter 45 of the Code the regents establish such departments of education, which we call professorships or chairs, in literature, science, art, agriculture and military tactics as they may deem expedient, and they make rules, regulations and by-laws for the government of the institution. The Code gives them power to appoint professors to fill the chairs in the several departments. By common law this power of appointment carries with it the power of removal, unless restrained by statute; but this power is affirmed and in words conferred by the Code giving the Board of Regents authority "to remove them (professors) for good cause, but in case of removal the concurrence of a majority of the regents shall be required, and the reasons for removal shall be communicated in a written statement to the governor." We must not fail to notice that this statute, not only gives the regents power of removal, but it makes that power very wide, because it does not specify any cause constituting ground of removal such as incompetency, immorality or other specific cause, but leaves it to the regents to judge of the cause of removal, to say what is good cause. And further, we must not fail to note that the Code commands the regents to report the cause of removal to the governor, the head of the executive department, thus making them accountable only to the governor. What their accountability to him is, what his powers as to any improper action in removal may be, it is not necessary for us to say; but the Code in that provision warrants us in saying that the legislature contemplated accountability of the regents, if any, only to the chief of the executive department, the power that appoints them. No intimation is breathed by the statute of their accountability to any court; but such accounability as is contemplated is to the executive. The proposition is asserted that every action of the regents may be made the subject of judicial review. That is what it amounts to prac-

tically.   When a professor is to be removed he must have notice, trial and some writ from a circuit court upon the theory of erroneous action by the regents, to review that trial, and then an appeal to the Supreme Court.   When the case is before the Board of Regents, under this theory, he must be allowed to have witnesses and counsel for full defense.   So the case may be made one of almost interminable litigation, to the great harm of the university.   And every case of removal may, probably would, be made the subject of protracted litigation.   In the meanwhile the incompetent professor would go on, and the harm to the university would be, or might be, very great.   Under this theory the courts would control the Board of Regents, would paralyze the arm of the executive, deprive the executive of its powers over the university plainly conferred by the legislature.   Thus the courts would practically exercise jurisdiction over the university, administer its affairs in greater or less degree, according as the litigations might be few or numerous, notwithstanding the Code plainly intended to put its government in the hands of the regents.   So far as I, by the compliment and favor of the people, have the honor to participate in the judiciary of the State, I am ready to disclaim the assumption of this power, which I would consider little less than usurpation.   It would be an invasion of the functions of the executive department.   There is no jurisdiction in this or any court to control the administerial action of the executive.   The Constitution itself divides the government into three separate departments, and forbids each to trespass upon the domain and jurisdiction of the other.   *Fleming* v. *Guthrie,* 32 W. Va. 1; *Goff* v. *Wilson, Id.* 405; *People* v. *Morton,* 156 N. Y. 136; 66 Am. St. R. 547; *State* v. *Hawkins,* 44 Ohio St. 98; *Keenan* v. *Perry,* 24 Texas 253; High, Extraord. Legal Rem, s. 118.   Prohibition does not lie to restrain executive action.   16 Ency. Pl. & Pr. 1108.   Are the courts, under any guise, to take charge of the boards of directors of the hospitals for the insane, the penitentiary, the normal schools, the school for the deaf, dumb and blind, the reform schools, the home for the incurables, the West Virginia Colored Institute, the Bluefield Colored Institute, and all other institutions of such nature as may be established by the State?   The question answers itself.   The proposition seems utterly unreasonable.   If the courts can take charge of one of them, why not take charge of all of them?   Their administration and goverance belong to

the executive department of the State, and the judiciary is forbidden by the Constitution from interference with them. Some one will ask, is the Board of Regents to do as it pleases, without control, erroneous as its action may be? Yes, so far as the courts are concerned. So the law is writ. The legislature has confided the power to them, as it must be confided to some hands, and the legislature has given no judicial process to revise the board's action, but in the matter of the removal of professors has required the board to report only to the governor. The lawmakers have chosen not to make the action of the board the subject of law suits.

Dr. Hartigan attacks the action of the regents as taken at the mere instance and caprice of the president of the university, and that action is assailed at the bar as imputable to worngful and malign motives on the part of the board towards Dr. Hartigan. It would be hard to select a Board of Regents of citizens standing higher for personal worth and professional and business fitness and capacity than the members above named as composing that board, and we see no just warrant for us to impugn the motives of six out of nine of such regents as moved by anything else than what they considered the welfare of the university.

There is another reason why this Court cannot reverse the action of the regents. The writ of prohibition does not lie in the case. If the action of the regents were subject to review by a court, it would be by *certiorari,* not prohibition. *Certiorari* is the proper writ to revise and reverse the action of inferior courts, boards or tribunals not of record, proceeding not according to the course of the common law, where no appeal or writ of error lies. *Cunningham* v. *Squires,* 2 W. Va. 422; *Morgan* v. *Ohio River R. Co.,* 39 *Id.* 17, 21; *Poe* v. *Machine Works,* 24 *Id.* 517. If that Board of Regents had jurisdiction of the matter of the removal of a professor, and that it has no one denies, may error committed by it, if any court had jurisdiction, could not be remedied by prohibition, because a prohibition only issues where an inferior tribunal has no jurisdiction of the subject matter before it, or having jurisdiction, exceeds its legitimate powers. *McConniha* v. *Guthrie,* 21 W. Va. 134; *Fleming* v. *Commissioners,* 31 W. Va. 619; *Town of Davis* v. *Filler,* 47 W. Va. 413, (35 S. E. 6); *County Court* v. *Boreman,* 34 W. Va. 362. But it is argued that while it is true that prohibition is not the proper remedy to review the order of an inferior tribunal

having jurisdiction, yet, where there is no notice to the party, there is no jurisdiction over him, and that the action of the tribunal is void, and therefore prohibition lies. It is true that a court or tribunal passing judgment or resolution must have both power to pass on the particular matter and over the person by a notice to him, where notice is required by law in the case, and in the absence of either its action is void, whenever its validity comes up; but that does not say what is the proper process to test its validity. If in this case notice were necessary, the order of the board would be void, say, yet that does not say that prohibition lies, and *certiorari* must not be used to annul the board's order. I say the true test is, that as the board had jurisdiction over the subject matter of the removal of a professor, any error it may have committed, including that of proceeding without notice, in wielding that jurisdiction, must be remedied by *certiorari,* not by prohibition, because prohibition is only to keep a court within the bounds of its lawful jurisdiction. I do not think prohibition lies where a circuit court renders judgment without service of process. Writ of error must be resorted to.

Suppose I were wrong in holding that we have no jurisdiction for the reasons, first, that to exercise such jurisdiction would invade the province of the executive department; and, second, that prohibition does lie. What then? I hold that the law authorized the regents to remove a professor without notice to him. The very able arguments of counsel in this case discussed the very important question whether a professor of the university is a public officer, in a legal sense, upon the theory that if such an officer, he must have notice of the proceeding of removal; whereas if not an officer, but a mere employe of the Board of Regents, he could be removed without notice. Entertaining the view that we have no jurisdiction I could excuse myself from discussing any further matter; but as counsel have presented other points for decision, I will advert to some of them.

I hold that if Dr. Hartigan's right to notice depends upon his being a public officer, he had no right to notice, because he is not a public officer, but a mere employe of the Board of Regents, in a legal point of view, and cannot, as a matter of right, demand hearing, right of defense and trial. The university is a corporation, and considering it merely in that light it is clear that the board can remove its employes at pleasure; for the officers or employes of a corporation have no franchise or property in their

offices, but are simply ministerial agents to carry out its corporate business, and unless its by-laws otherwise provide, may be removed at the pleasure of the corporation. *Burr* v. *McDonald,* 3 Grat. 215; *Richards* v. *Clarksburg,* 30 W. Va. 491. As the State has given corporate character and separate organic government to the university, it might not be going very far to entertain this view; but I will go upon the opposite hypothesis. What is a public office? The word is used in so many senses that it is impossible to give a precise definition covering all cases. It depends, not on what we call it, or even on what a statute may incidentally call it, but upon the powers wielded, the functions performed, and other circumstances manifesting the character of the position. *State* v. *Kennon,* 7 Ohio St. 546. Mechem on Office and Officers, s. 4, says: "The most important characteristic which distinguishes an office from an employment or contract is, that the creation or conferring of an office involves a delegation to the individual of some of the sovereign functions of government, to be exercised by him for the benefit of the public; that some portion of the sovereignty of the country, either legislative, executive or judicial, attaches, for the time being, to be exercised for the public benefit. Unless the powers conferred are of this nature, the individual is not a public officer." It at once struck me in reading the wilderness of law upon the simple but difficult question, what is a public office? that the requirement to make one a public officer he should exercise something that can fitly be called a part of the sovereignty of the State, was a test. This test is approved as an important or chief one in *State* v. *Jennings,* 57 Ohio St. 415, 63 Am. St. R. 723. It is stated to be the true test in *Eliason* v. *Coleman,* 86 N. C. 235. It has been often approved as a strong index. High, Extra. L. Rem. s. 625; *Doyle* v. *Alderman,* 89 N. C. 133, 45 Am. R. 677; Opinion of Judges of Maine, 3 Greenleaf 403; *United States* v. *Lockwood,* 1 Pinney (Wis.) 359; *State* v. *Valle,* 41 Mo. 31; *State* v. *Hocker,* 39 Fla. 477, 63 Am. St. R. 174. I ask, what part of the sovereignty of the State does a professor in a college exercise? "Office is a public station or employment conferred by the government, and embraces the idea of tenure, duration, emolument and duties." *United States* v. *Hartwell,* 6 Wall. 585; *Bunn* v. *People.* 45 Ill. 398; Throop, Pub. Office, s. 3; *Shelley* v. *Alcorn,* 72 Am. Dec. 169, 182; *United States* v. *Hatch,* 1 Pinney 182; Mechem, Pub. Office, s. 8; *Hall* v. *Wisconsin,* 103

U. S. 8. "An office is a public charge or employment. The duties of the employment must be continuing, and prescribed by law, and not by contract. Employment, though usual, is not a necessary element of an office." *State* v. *Hocker,* 39 Fla. 477, 63 Am. St. R. 174. A professor of the university has not what is called tenure in office, no fixed term. That he is paid makes him no officer. A mere employe is paid. That an official oath is required by law is a sign of office, and our Code prescribes it as to officers, but does not require a professor to take it. Where a statute prescribes specific duties for an office, it is a strong circumstance that an office is intended; but the Code prescribes none for a professor. Chief Justice Marshall, in *United States* v. *Maurice,* 2 Brock. 96, said: "Although an office is an employment, it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act or perform a service, without becoming an officer." So say many authorities. Now, a professor in the university simply accepts an offer of the regents to teach for a compensation, with no fixed term, no oath, his duties not defined by statute, simply general as pertinent to the branch of education which he teaches, with an element in the contract put in it by the law giving power to the regents to end it at pleasure. In fact, as suggested by Regent Brown in his answer in this case, there is a by-law of the university giving the regents, and also the professors, right to cease relations, to end a professorship, on sixty days notice, which is proof that the relation of a professor is only of a contractual nature, not that of a public officer. The board, while removing Dr. Hartigan, continued his pay for at least sixty days thereafter and gave him notice thereof. This notice, is not a notice of the proceeding to remove, but notice of the cessation of the professorship and pay, and it concedes, as a matter of contract, the right of the regents to close a professorship. When Dr. Hartigan became a professor under that by-law he made that contract, and regent James F. Brown, who is an able lawyer practicing at the bar of this Court, in his answer says that while he differed from the board as to the expediency of the removal of Dr. Hartigan, yet he concedes the power of the board to make the removal under the statute, and regards it as a severance of relation between the profsesor and the university as per contract under the said by-law. Regent Brown opposed this proceeding, moved to quash the rule, because un-

sustainable in law. But to return to the line of thought stated above, a professor in the university wields no particle of sovereign governmental authority. In a legal view, he simply makes a contract with the corporation to teach in the university. In a legal view, what is the difference between a teacher in a public school and a professor in the university? None, except in grade or eminence of station. Both are teachers in the public educational system. The district teacher is in the employ of a corporate body, a board of education, a branch of the government; a professor is in the employ of only another board of education, under another name, a branch of the government. This Court has decided that a teacher is not a public officer, LUCAS, PRESIDENT, very correctly saying what is apt in this case: "The teacher is not, in this State, a public officer, but is an employe, and his position is not a public office, but an employment. The teacher is responsible, not to the public, nor the partons of the school, but to the proper school officers, the trustees, board of education, county superintendent and State superintendent of free schools." *Heath* v. *Johnson,* 36 W. Va. 782. PRESIDENT LUCAS said that the teacher was a subordinate of the school officers, their employe, and I say that a professor, learned and distinguished as he may be, is an employe and subordinate of the Board of Regents, in law. That board is charged with the public function of education, and to perform it employs teachers called professors.

"Among the criterions for determining whether an employment is a public office or not are the delegation of a portion of the sovereign functions of the government; the requirement of an official oath; that the powers are created and conferred by law, and not by contract; and the fixing of the duration or term of office." *Hendricks* v. *State,* 20 Texas Civ. App. 179.

Now, with pointed application to this case I cite the case of *Union Co.* v. *James,* 21 Pa. St. 525. The question was whether a professor in an incorporated university was an officer, and the decision was that he was not an officer, but a person in the employment of the corporation. In *Butler* v. *Regents,* 32 Wis. 124, the court says: "We do not think that a professor in the university is a public officer in any sense that excludes the existence of a contract relation between himself and the board of regents that employed him, in respect to such employment. It seems to us that he stands in the same relation to the board that a teacher

in a public school occupies with respect to the school district by which he is employed, and that is purely a contract relation." So it is clear that a professor is not an officer, but an employe under contract to fill a chair of learning. Therefore, outside of any statute, as an employe he may be removed or discharged without notice, without hearing. But I admit there is a statute involved, and that whether a professor is an employe or officer, he cannot be discharged contrary to that statute, except for that by-law above referred to; but I say that a professor being only an employe throws light on the construction of the statute providing that the board may remove "for good cause," because we cannot conceive readily that the legislature meant to require notice and trial in the case of one occupying simply the position of an employe. It is claimed that as the Code limits removal to "good cause," this imports the necessity of specification of charges, notice and trial. I do not think such is the meaning of the Code. It seems to leave the cause of removal entirely to the regents, because it does not specify such cause. Usually grounds of removal are specified, and the power is then restricted, as for official misconduct, incompetence and other causes with relation to certain officers in chapter 7, Code; but here no cause is specified. A professor might be competent and none of the usual causes for removal imputable to him, and yet from mere temperament or manner of intercourse with students, there might be disharmony between them hurtful to the institution. Could not the regents terminate his professorship? Numerous cases hold that where a statute allows removal of an officer—even an officer—under the general language "for cause" (which is tantamount to good cause), unless the statute calls for notice, none is required, and removal is discretionary, and in such cases there can be no review by the courts. Throop, Pub. Officers, ss. 366, 396; *Trainor* v. *Board,* 15 L. R. A. 95. In *Mayor* v. *Gear,* 3 Dutcher (N. J. L.) 265, it is held that where the charter of a city provides that the council may remove for cause any person appointed by them, the council was not thereby erected into a tribunal to hear and determine, requiring notice to be served on the party removed before they got jurisdiction of the person, and that the words, for cause, only meant such cause as was satisfactory to the council. So I say that no causes of removal being specified by our statute, the words for cause are only directory and intended to be impressive upon the board not to remove ar-

bitrarily. In *People* v. *Bearfield*, 35 Barb. 254, it is laid down that "Where the law creating an office designates the power which is to appoint and remove, but fixes no form of proceeding and requires no trial to precede a removal; contains no requirement as to the grounds of removal, except that there shall be credible information of neglect of duty; and gives no right of appeal or review; the supreme court has no authority to review the exercise of the discretion" of removal. The supreme court of Arkansas in *Patton* v. *Vaughan*, 39 Ark. 211, held: "In the absence of constitutional or legislative restriction, where no definite term of office is prescribed by law, the power of removal is incident to the power of appointment; and it is a corollary of this rule that where the appointing power may remove for cause, he is the sole judge of the existence of the cause. Just our case. See *O'Dowd* v. *City*, 149 Mass. 443; *Regents* v. *Mudge*, 21 Kan. 223; *Attorney-General* v. *Doherty*, 25 La. Ann. 119; *Bunn* v. *People*, 45 Ill. 397, to same effect. Instance the case of *People* v. *Thompson*, 94 N. Y. 451. Removal was by the law prohibited until "he has been informed of the cause of removal, and been allowed an opportunity for explanation." Held, that the party was not entitled to trial, that proof of the charges was not necessary. The court said that there was nothing in the statute requiring proof, or allowing trial or cross-examination. "If the commissioner was to be constituted a court for the purpose of trying every charge which might be preferred, it would tend very much to embarrass that officer, and interfere with the interest of the public." So in this case. Is there to be a formal charge, a formal notice to answer, a trial by witnesses, and argument of counsel in every case where the regents may deem the removal of a professor expedient? How long would the trial last? What would become of the interests of the university? It is not a private right which may be made the subject of litigation between parties. The legislature never intended this great inconvenience to the public service. It did not intend to make a court out of the Board of Regents. They are an administrative or executive body, not judicial. In *State* v. *McGarry*, 21 Wis. 502, an act authorized the supervisors to remove an inspector of a house of correction "for incompetency, improper conduct or other cause satisfactory to the board." Held, "Under said act the board may remove without examining witnesses under oath, or giving the officer previous notice of the investigation." Public

office is not property under the constitutional clause against depriving of property without due process of law, not admitting of private ownership, but being a trust for the public, there is no restraint upon the legislature in providing any process of removal it chooses. *Moore* v. *Strickling*, 46 W. Va. 515; *Taylor* v. *Beckham*, 178 U. S. 548; *Wilson* v. *North Carolina*, 169 U. S. 586. I do not say that where there is a fixed term for a public office, not a mere employment, or a tenure during good behavior, and the law specifies certain cause for removal, there need not be notice; but I say that where no cause of removal is specified, but is left discretionary with the removing power, there need be no notice of hearing. *Town of Davis* v. *Filler*, 47 W. Va. 413, (35 S. E. 6) ; *Coleman* v. *Glen*, 103 Ga. 458, 68 Am. St. R. 108, 112; Throop. Pub. Officers, s. 361. If a professor were an officer, he has no term, and surely cannot hold for life; but the power to remove being given to the regents for good cause, but that cause not being assigned, and no notice or trial provided for, leaves the strong inference that the cause is just what the regents may deem proper in the interests of the institution, and was intended to be a matter of discretion. Why any notice if there is to be no trial, and the matter is one of discretion with the board? This is so even if a professor be regarded an officer; but he is no officer. From the nature of the case and the interest of the institution the regents should have this power of removal, at discretion, without trial, and I think the legislature so intended. This being so, there is no jurisdiction in this or any court to review their action. "No principle is more firmly established than that where a special and exclusive authority is delegated to any tribunal or officer, and no mode of revising his decision by appeal or otherwise is provided by law, his action is final." *Keenan* v. *Perry*, 24 Tex. 253. It cannot be that the legislature contemplated making the Board of Regents a trial court, and then *certiorari* to review their action, and then a writ of error to this Court, a long litigation over a professorship. If the legislature so intended, why did it not give an appeal or *certiorari* from the decision of the regents, instead of requiring them to report to the governor?

Of the many cases cited for petitioner I will say that they are cases of the removal of public officers, where the law specified only certain causes of removal, or pointedly required notice, or where the offices were for fixed terms. For instance, *Dullam* v.

*Wilson,* 51 Am. R. 128, a public officer, the Constitution speci-fying particular grounds of removal. *Murdock* v. *Academy,* 12 Pick. 244, was the case of a theological institution where the statute pointed out grounds of removal and gave an appeal from the trustees to the supreme court. *State* v. *St. Louis,* 90 Mo. 19, case of a public officer for a fixed term, removable for cause. *State* v. *Haight,* 39 N. J. L. 14, public officer. *State* v. *Pritch-ard,* 36 N. J. L. 101, a public officer. *Field* v. *Commonwealth,* 32 Pa. St. 478, was the case of a public officer removable only for neglect of duty, incompetency or immorality, and a fixed term. *State* v. *Brice,* 7 Ohio 282, case of a public officer. *Page* v. *Hardin,* 8 B. Mon. 672, was the case of a secretary of state holding office for a fixed term under the constitution of Ken-tucky. Willard's Appeal, 4 R. I. 601, simply decides that a school committee had power to remove its clerk if notice and hearing were given, and the court did not have to decide, and did not decide, whether or not the removal could be made with-out notice. *Foster* v. *Kansas,* 112 U. S. 201, only involved the question whether a state law for the removal of a state officer was repugnant to the Federal Constitution, and did not at all in-volve the question of notice or hearing, because the statute pro-vided for notice. It has nothing to do with this case. *Kennard* v. *Louisiana,* 92 U. S. 480, simply held that a state statute fixing the mode of contest between contestants for a judicial office was not repugnant to the fourteenth amendment. It decided only a Federal question. Notice was not up in the case. The case has no aptness to the present case. And I do not see that in any of the cases cited for Dr. Hartigan the proceeding was by writ of prohibition. Prohibition refused and ruled discharged.

BRANNON, PRESIDENT:

Being anxious to reach a correct conclusion in this case, and in view of difference of opinion in the Court, I have further ex-amined the subject since writing the above opinion, and as the case is important, and there is no case in our State Reports of like character, I have thought it pardonable, even at the expense of prolixity, to cite other cases coming to me in such further investigation, which are strongly confirmatory of positions taken in the above opinion.

As to the point that a professor is not a public officer I add to

the cases already given the case of *The People* v. *New York Post-Graduate Medical School*, 29 N. Y. App. Div. 244, where the supreme court of New York held that a professor in a medical college was not an officer of that college, but a mere appointee working under contract. If it be said this was a private corporation, I respond that our university is a corporation, and though a public one, its professors are simply employes, just as a professor in a medical college. Both in the nature of function are the same. Neither is an officer of State, county or town. In that case one by-law provided that a professor should hold during the pleasure of the board; a later one provided that a chair might be vacated on charges, with notice and right of defense. The professor held for a fixed term. Notwithstanding this, the court said one by-law was to sever relations for any cause, the other was for cause; that in the one case the by-law contemplated a mere severance of contractual relations, without notice or trial, exactly as regent Brown claims was within the power of the board in this case, without any crimination or stigma, whereas, the other by-law contemplated offense or criminality, involving stain and stigma. The court upheld the right of removal without notice. The court said: "The college should not be tied to a particular person, who, however able and worthy happens to be afflicted with temperamental qualities which render association with him disagreeable. There can be no good reason why such a person should be permanently afflicted upon his associates as long as he does nothing which renders him amenable to charges. Relations with such a man may properly be severed at pleasure. Not so, however, as to a guilty man. It would be a practical condemnation to remove such a man at pleasure. He should not be permitted to escape by that easy process." That was a stronger case against right of removal than this. Apply it to this case. Here are a college and a professor. The board does not think him suitable. It cannot, or does not wish to, specify things of criminality or offense. It ought to have power of removal, or to end the contractual relation as its by-law, under which a professor takes the chair, expressly allows. It has that power under that by-law. Indeed, it also has it under the Code, because that gives power of removal for cause, but not specifying cause, leaves that to the board, and thus makes a professor hold during pleasure. All cases show that where the holding is during pleasure of a given body, removal may be made without noitce

or trial. To show that I do not err in stating in the above opinion the *criteria* of public office, I cite the great name of Judge Cooley in delivering the opinion in *People* v. *Throop,* 40 Mich. 673, saying, "An officer is distinguishable from an employe in the greater importance, dignity and independence of his position, in the requirement of an official oath and perhaps bond; in liability to account for misfeasance and non-feasance, and usually in the tenure of his position." A professor takes no oath, gives no bond, does not account for misfeasance or non-feasance in a legal sense, has no term, no duties of a fixed determinate character fixed by law. He is no officer. He is no *quasi*-officer. There can be no such thing as a *quasi*-officer.

Turning now from the proposition that a professor is not a public officer, I will cite cases bearing on the question whether want of notice vitiates the action of the board. Take the case of *People* v. *Higgins,* 13 Ill. 110. An act incorporated the Illinois State Hospital for the Insane, and created the office of medical superintendent, to be appointed by the trustees for ten years, and be subject to removal only for infidelity to the trust reposed in him, or for incompetency, and it was held that the trustees might remove without assigning any specific cause, when the interests of the institution required, without notice or trial. In another case the governor was authorized to remove any officer by him appointed "in case of incompetency, neglect of duty, or malfeasance," and it was held that though the park commissioners of Chicago were public officers, they might be removed by him, and that as the constitution was silent as to the mode of procedure, he might determine whether cause for removal exists, and no mode of inquiry being prescribed, he could ascertain the facts by any process he might adopt, and the courts could not interfere. *Wilcox* v. *People,* 90 Ill. 186. In *People* v. *Mays,* 17 Ill. App. R. 361, the law gave a county superintendent of schools a term of four years and made him removable for any palpable violation of law or omission of duty. Held, that no notice or trial was necessary, giving as reason that as the statute conferring power of removal prescribed no method of procedure, none was necessary. In our case the act broadly gives power of removal, specifying no cause, thus leaving cause to the regents, and directs no notice or form of procedure. Shall a court review and say that is not cause of removal, which the regents held good? Shall we say who are fit and competent professors? Shall we say their

conduct does, or does not, warrant removal, no matter what the regents say? We have this jurisdiction in law suits; but this is no law suit between parties. It is a mere administrative proceeding. The regents are not responsible to this Court. "When the power of appointment to office is conferred in general terms and without restriction, and duration of term is not fixed by constitution or statute, the office is held only during the pleasure of the authority making the appointment, and it may remove the appointee at any time," without charge or trial or notice. *People* v. *Robb,* 126 N. Y. 180; *City of Leadville* v. *Bishop,* 14 Colo. App. R. 517.

*Resume!* Thus I hold:

1. Prohibition does not lie for two reasons, one that it would interfere with executive action; the other that if any writ would lie, it would be *certiorari.*

2. That no writ lies, because (a) a professor is not an officer, but an employe, and is not entitled to notice or charges or trial; (b) and even if an officer, the act specifying no cause of removal, nor directing notice or procedure, no notice or trial is required; (c) the board had right, under the by-law, to terminate the contract, without any legal ground of removal, but as part of the contract.

BRANNON, PRESIDENT:

After handing down the above opinions, I meet the case decided 8th February, 1901, by the supreme court of Maryland, *Mayor* v. *Lyman,* reported in No. 3 Advance of 48 Atl. 145, holding that the superintendent of schools of Baltimore is not an officer, but an employe or agent. The reasons given are in effect those stated above. The case cites several apposite authorities, among them *Commissioners* v. *Goldsborough,* 90 Md. 193, 207, 44 Atl. 1055, holding that civil officers are those wielding the state sovereignty, and that when a governmental function is exercised by a public corporation created for the purpose, and the members have no authority to act as individuals, but only in a body, they are not civil officers. The case holds that school commissioners constituting a corporation for each county are not officers. The case goes to show that members of a public corporation, even regents, like our university, are not public officers, but of a public corporation, and are under power of the executive de-

partment. If directors or regents are not officers, much less are its agents, the professors. In *State* v. *Vickers,* 58 Ohio St. 730, it is held that a superintendent of schools is not an officer. Because the cases are valuable for reference and authority, and because I regard them as sustaining views expressed in the above opinions filed by me, I think it proper to make this postscript.

I call special attention to the case just observed of *Worthy* v. *Barrelt,* 63 N. C. 199, making the distinction between officers and placemen, and stating that a test of an officer is whether by law he must take an oath to support the constitution, and citing with approval an opinion of the United States Attorney General making this a test, and holding that mere agents of the state like "visitors to state institutions, directors of state banks or other state institutions," are mere agents, not officers.

*Writ Denied.*

DENT, JUDGE, *(dissenting):*

1. By the terms of the statute authorizing their creation professorships in the State University are as to the removal of the incumbents *quasi-public* offices and no such removal can be operative or valid until good cause shown after notice, and an opportunity of defense has been afforded the incumbent proposed to be removed.

2. By good cause is meant some just cause affecting materially the interest and well being of the university.

3. The acts of the regents of the university in its government and control in all proper cases is subject to review by the courts by *certiorari, mandamus* and prohibition when such writs are necessary to prevent such regents exceeding or abusing their legitimate powers.

4. A rule, regulation or by-law adopted by the regents inconsistent with the charter statute of the university is void.

5. The *ex parte* order of the circuit court refusing an alternative writ of *mandamus* or a rule in prohibition is not reviewable by writ of error; but an original application should be made for such refused writs to this Court, the refusal order satisfying the requirements of Rule XIII of this Court, 23 W. Va. 829.

Dr. James W. Hartigan petitions for a writ of prohibition against the majority of "The Regents of the State University to prevent them from enforcing an alleged invalid order removing him from a professorship."

The facts are as follows: The petitioner has been occupying a professorship in such institution for thirteen years. On the 18th day of December, 1900, at the city of Parkersburg, the regents by a majority vote adopted the following order, to-wit: "Whereas, the interests and prosperity of the university will be promoted in the judgment of the majority of the regents by the removal of Jas. W. Hartigan, M. D., from his chair as professor of anatomy in the university; thereupon it is ordered that said Jas. W. Hartigan, professor of anatomy, be and is hereby removed from said chair, and professorship, to take effect on the first day of March, 1901, and that from and after that date his salary and connection with the university shall cease and determine, and he is hereby relieved from all work and duty from January 1, 1901."

Regents Campbell, Hamill, Kunst, McMahan, Powell and Sturgiss voted for the resolution, and Regents Davis and Eastham voted against the same, and had the following protest entered of record: "Regents John J. Davis and P. C. Eastham protest against the action of the board in removing Dr. James W. Hartigan from the professorial chair occupied by him in the university, because there were no specific charges of incompetency, immorality or unfitness for the discharge of the duties devolving upon him as a professor in the said institution nor any good cause shown for his removal, and for the further reason that the said James W. Hartigan was denied the right to be heard in his own defense." Regent Davis also moved to lay the resolution of removal on the table, and that James W. Hartigan, M. D., be invited to appear before the board at a future date to show cause, if any he can, why he should not be removed as a professor, and that he be served by the secretary of the board with a copy of the reasons for his removal," which motion was voted down. Regent James F. Brown, who was not present at the time the order of removal was adopted, and who had not been specifically notified that there were any charges against the petitioner, or that any effort would be made to remove him, after being informed that such removal had taken place, appeared before the board and asked that the resolution be reconsidered, but the president of the board ruled his motion out of order. He then had his protest against the action of the board entered of record.

On the 26th day of December, 1900, some days after the final

adjournment of the board, a copy of the resolution of removal was served on petitioner, being the first legal notice he had thereof. The majority of the regents to avoid the effect of want of notice to the petitioner set up in their answer that as early as June 7, 1898, the president of the university verbally reported certain derelictions on the part of the petitioner, and the president of the board was authorized and requested to call upon petitioner and admonish him of the views expressed by the board. What these derelictions consisted in is not shown in any way, except it is intimated that it was opposition to the policy of the president. There is no pretense that there were any written charges against him, or that he was in any manner notified of the verbal charges or accorded an opportunity of defense thereon. That at a meeting held in April, 1900, the president preferred charges in writing to the effect that petitioner was untruthful, unscientific, grievously neglected his duties, was wasteful of the university property committed to his charge, and was inefficient as a teacher, and filed details and statements of facts in support of such charges, and testimony and evidence of various kinds, and witnesses orally and otherwise were brought before said board and considered in connection with such charges. And it was further alleged that Dr. Hartigan appeared before said board at that time with his witnesses and evidence, and that he was given a full, fair and complete hearing at that time, and his case was impartially considered. Yet the answer fails to allege and show what conclusion was reached by the board, if any, but attempts to leave the impression that the whole matter was held open for future consideration. The best and only evidence of all these things is the record kept by the board. Yet no part of it is exhibited with the answer or in any manner shown to the court.

Dr. Hartigan denies all this under his oath, and claims that on being informed by one of the regents as a personal friend that the president had preferred charges against him, and was seeking his dismissal, he voluntarily went before the board and importuned them to inform him of the charges against him, but the president of the board refused to give him such information, but informed him and gave him to understand that the charges were abandoned. The answer further alleges that at the meeting in June, 1900, the president again orally made complaint against Dr. Hartigan, and demanded his dismissal from the faculty, but

there is no record evidence that Dr. Hartigan had any notice thereof, and he shows by his affidavit that his information was that these charges were wholly abandoned by the board, and no proper trial thereof was in any manner had. It is admitted by the majority of the board that at this June meeting after all these various charges by the president, the board virtually dismissed them, and having divided the chair of biology occupied by Dr. Hartigan into several chairs, they appointed him to fill the chair of anatomy. Thus if he had been guilty of any of the several charges against him preferred by the president at the various meetings of the board, which is nowhere made to appear by the record or otherwise, the act of the board in confirming him in his professorship either dismissed the charges or condoned them. *Gill* v. *Watertown,* 9 Wis. 254. So that it may be safely found that at the time of the meeting of the board in December, 1900, there were no charges pending against him of which he had any knowledge or information, and that these matters are simply brought into this record as a mere attempt at paliation and excuse for the plainly unjust action of the board taken at the meeting in Parkersburg against Dr. Hartigan in his absence and without notice or knowledge thereof of any kind on his part.

The real merits of this case, therefore, arise on the demurrer to the petition, and motion to quash the rule. One question presented for consideration is the allegation that Regent Hamill is a non-resident of the State, and thereby ineligible to the office of regent. This is denied by the affidavit of Mr. Sturgiss. Mr. Hamill, although a party individually and served with process, makes no answer thereto, while the officer who served the process at his actual place of residence, Columbus, Ohio, swears that Hamill is a non-resident of the State. Since, however, Regent Campbell adopts the answer of the majority of the board, this question becomes unimportant, for with his voting for the removal of Dr. Hartigan, the vote of Hamill is not needed to make the necessary legal majority. The next question of importance is as to whether all the regents were duly and legally notified that the removal of Dr. Hartigan was one of the purposes for which the meeting at Parkersburg was convened. The notice given was a general notice in the terms of and covering all the subjects embraced in the statute. It gave no information whatever that the removal of Dr. Hartigan was a matter to be con-

sidered, or that there were any charges against him. It was a mere attempt to comply with the letter and not the spirit of the law, and was calculated to mislead rather than inform the several regents as to the purpose of the meeting and designedly so. The meeting was called for Parkersburg, one hundred and twenty-five miles from the seat of the university. Dr. Hartigan was not notified of the meeting, and the notice was so worded as to conceal from any friend he might have on the board of the true purpose of the meeting, and thus prevent such friend from giving him information thereof. In short, it is plainly apparent that the scheme of the meeting was not only not to give him notice, but to prevent him from having information thereof from any source until the purpose thereof had been fully accomplished. A long time ago it was declared to be law that "All acts done at an unusual place by a municipal corporation carry the appearance of contrivance, secrecy and fraud." Angell & Ames on Corporations, section 496. So it may be said of all corporations. The proper place of meeting of the "Regents of the University," is at the seat of the university, and here alone can its business be properly discharged. The regents cannot hold their meetings one hundred and twenty-five miles away and properly control and govern it on information furnished by the president. They should hold them at the institution where they may inquire of the professors and students and various officers as to its necessities or as to the truth of any charge preferred by the president against professors, students, officers or employes. Otherwise a designing president can easily make them the dupe of falsehoods and misrepresentations, not for the good of the university, but for his own personal ends, and the institution thereby be greatly injured. It may be claimed that the meeting was called at Parkersburg for the convenience of the regents, that Regent Powell lived there, Regent Campbell lived at New Cumberland, Regent Hamill lived at Columbus, Regent Brown at Charleston, Regent Kunst at Weston, Regent Eastham at Point Pleasant, Regent Davis at Clarksburg and Regent McMahon at Harpers Ferry. These regents were not appointed to consult their own convenience, but to visit the university and properly control and govern it. Not one of those mentioned so far as the record discloses had visited the university since the June meeting, and they knew nothing of its needs except through the information furnished by the resident regent or the

president.  Hence the removal of Dr. Hartigan was made on their representations alone.  If the regents cannot afford the time to go to the university and govern it righteously and legally they should resign and allow their places to be filled with like honorable men who can and will do so.  The institution should not be allowed to suffer by reason of their neglect.  The question as to whether the regents were properly notified is so dependent on the main question in this case, namely, whether Dr. Hartigan was entitled to notice and hearing, as to render the determination of it wholly unnecessary.  If Dr. Hartigan was entitled to notice and hearing the prohibition must be awarded without regard to any of the other questions raised, and if he is not so entitled, and the board has authority to arbitrarily dismiss him without a hearing, and for cause satisfactory to themselves, then he cannot complain of any action of the board however illegal or unjust it may be.  Respondents insist that even public officers may be removed by the appointing power without notice and hearing when the statute authorizes them to be removed "for cause," or "good cause," and refer to the following decisions to sustain this position: *Mayor of Hoboken* v. *Grear*, 3 Butcher (N. J. Law) 265. This not very well considered case so holding is completely overruled by the later and better considered case by the same court of *Haight* v. *Love*, 39 N. J. Law 14, where it is held that "The power to remove 'for cause' can only be exerted for just cause, and after the officer has had an opportunity for defense." *State* v. *Prichard*, 36 N. J. L. 101.   *O'Dowd* v. *City of Boston*, 149 Mass. 443, is not a case in point.  In that case the law provided that the officers and boards of the city of Boston may remove their subordinates "for such cause as they may deem sufficient, and shall assign in their order of removal."  The words "they may deem sufficient" gave the board complete and final control over the cause of removal, and are almost equivalent to the words "at pleasure."  In the case of *Patton* v. *Vaughn, Judge,* the question was presented as to whether the circuit court had the right to review by *certiorari* the order of a county judge removing a coal oil inspector for cause, and it was held that under the statute laws of Arkansas the right of review did not exist, but that the action of the county court was final.  In the case of *The Regents* v. *Mudge*, 21 Kansas 223, it was held that under the laws of Kansas the regents of the Agricultural College had the power to contract with teachers for their services for a given

period, and if they discharged them without just cause before the period of service elapsed, the teacher or professor so discharged could recover for the full time of his employment. The case of the *People* v. *Baerfield,* 35 N. Y. 254, denies the power of review in cases where the removal of an officer is authorized to be made by the appointing power on credible information. In the case of the *State* v. *Dohety,* 25 Pa. 119, it was held that the supreme court had no authority to review the action of the governor in a collateral proceeding dismissing a tax collector for failing to do his duty. In the case of *Bunn* v. *State,* 45 Ill. 397, certain commissioners appointed to superintend the building of a new state-house, were held not to be officers within the meaning of section 12, Art. IV, of the state constitution. In the case of the *People* v. *Higgins,* 15 Ill. 110, the supreme court held that a superintendent of a hospital for the insane was properly removed "on the ground and for the reason of his incompetency to the discharge of the duties thereof, it appearing "that at the time of the order for said removal said Higgins was present before the said board of trustees, and before the passage of the resolution as aforesaid, was heard by said trustees in his defense, and then interposed no objection to the consideration of the question of said removal at that time, and did not ask or express any desire for the postponement of said resolution." The superintendent was present, thus having actual notice and had full opportunity for defense accorded him. He was not one hundred and twenty-five miles away discharging the duties of his position at the place where the meeting of the board could be properly expected, and he was not kept in entire ignorance of its meeting or its proposed action until it had been fully accomplished. Some of these decisions might tend in a degree to sustain respondents' pretensions, were it not for the immense and overwhelming array of authority to the contrary. In Mecham on Public Officers, s. 454, it is said that where the appointment or election is made for a definite term or during good behavior and the removal is to be for cause, it is now clearly established by the great weight of authority that the power of removal cannot, except by clear statutory authority be exercised without notice and hearing, but that the existence of the cause for which the power is to be exercised must be first determind, after notice has been given to the officer of the charges made against him, and he has been given an opportunity to be heard in his defense. *Dullam* v. *Wilson,* 53

Mich. 392; *State* v. *St. Louis*, 90 Mo. 19; *State* v. *Haight*, 39
N. J. L. 14; *Slate* v. *Pritchard*, 36 N. J. L. 101; *Field* v. *Commonwealth*, 32 Pa. St. 478; *State* v. *Bryce*, 7 Ohio 282; *Page* v.
*Hardin*, 8 B. Mon. (Ky.) 672; Willard's Appeal, 4 R. I. 601;
*Foster* v. *Kansas*, 112 U. S. 201; *Kennard* v. *Louisiana*, 92 U.
S. 480.

In Throop on Public Officers, s. 364, it is said: "The doctrine
that an officer can be removed only upon notice and after a hear-
ing where the tenure of his office is during good behavior or until
removed for cause, is recognized in other American cases, and
may be regarded as settled law in this country. And a removal
without notice and a hearing in either of these cases is erroneous
and void." This has been recognized to be the law of this State.
*Filler* v. *Town of Davis*, 35 S. E. 6; *Arkle* v. *Comrs.*, 41 W. Va.
471. In the case of *Richards* v. *Clarksburg*, 30 W. Va. page 501,
JUDGE WOODS states the law to be: "If the officer be a minis-
terial one holding during pleasure he may generally be removed
without notice or trial and he is in fact removed upon the ap-
pointment of a successor; but if he holds during good behavior,
or for a fixed term, he can only be removed after summons and
after having license, and opportunity to be heard for himself."
Respondents further insist that although this be the settled law,
a professor in the university is not a public officer, and therefore
not entitled to the benefit or protection thereof, and therein they
misconceive the reason underlying the law. For it is not an at-
tribute of public office generally, but it applies only to the offices
in which the incumbent has a vested right until lawfully removed
therefrom. Offices are not such property as to require a jury
trial to devest the incumbent, within the meaning of the State
or National Constitution. *Moore* v. *Strikling*, 46 W. Va. 515.
Yet the vested right to continue in an office, or other public posi-
tion or engage in any public employment is a matter of value in
the nature of property of which the holder cannot be deprived
without due process of law. *Moore* v. *Strikling*, cited; *Dryden*
v. *Swinburn*, 15 W. Va. 248; *Phares* v. *Slate*, 3 W. Va. 567; *ex
parte Wall*, 107, U. S. 265. If the employment be such as the
deprivation thereof can be fully satisfied in damages, then the
courts will not interfere to restore the incumbent to his position,
but will leave him to his action for damages. In the case of *Ken-
nedy* v. *Board*, 82 Cal 492, this is conceded to be the general
rule, except where there "is a direct statutory prohibition against

a removal except for cause." But where his reputation is involved and the position is one of honor and profit, and his damages are non-ascertainable or incapable of liquidation on proper application therefor, the teacher will be restored to the position from which he has been unjustly excluded. High Rem. 78; *Rex* v. *University,* 1 Strange 567; *Bragg's Case,* 11 Coke 99; *Morley* v. *Power,* 5 Lea (Tenn.) 701; *Stanley* v. *Van Siclen,* 43 Hun. (N. Y.) 537; *Kennedy* v. *Board,* 82 Cal. 483; *Fuller* v. *School,* 6 Conn. 532. So the true question is not whether the person whose rights are involved is strictly speaking a public officer, within the meaning of sections 5 and 6, Art. IV of the Constitution, but whether he has a statutory right to hold a public position or engage in a public employment, either an office or in the nature of an office, until he is removed therefrom for good cause. If the statute confers upon him such a right, he cannot be deprived thereof except by due process of law or by the law of the land, "a law which hears before it condemns; which proceeds upon inquiry and renders a judgment only after trial." In short such right cannot be taken from him except on judicial investigation as to whether such good cause exists. As to public school teachers, this question has been fully settled. See cases before cited.. The rule in substance in *Morley* v. *Power,* 5 Lea (Tenn.) 701, is that the right to remove a teacher employed under a valid contract is limited by statute, and can only be exercised after notice, and upon proper testimony. In such cases the charges must be specific, so as to notify the teacher thereof that he may make a proper defense thereto. *Morley* v. *Power,* 10 Lea (Tenn.) 219; *Edinboro Normal School* v. *Cooper,* 150 Pa. St. 78; *Murdock* v. *Visitors,* 7 Pick. 330. Dismissal without cause is void. *District* v. *Hale,* 15 Col. 367; *Finch* v. *Cleveland,* 10 Barb. 290; *Whitehead* v. *North,* 25 Pa. St. 418. The power of removal for cause is *quasi judicial.* *McCrea* v. *Pine Top School District,* 145 Pa. St. 550; Mechem Public Officers, ss. 638, 639; *Burton* v. *Fulton,* 49 Pa. St. 157; *Chamberlin* v. *Clayton,* 56 Ia. 331; *Elmore* v. *Overton,* 104 Ind. 348; *Dritt* v. *Snodgrass,* 66 Mo. 286. In the case of *Butler* v. *Regents,* 32 Wis. 131, it was held that under the statutes of Wisconsin a professor in the university was not strictly speaking a public officer, but that he stands in the same relation to the board that a teacher in a public school occupies with respect to the school district by which such teacher is employed, and therefore such professor could not be dis-

charged before the time of his contract of service had expired without full payment of his salary. In the case of *Hall* v. *Wisconsin,* 103 U. S. 5, it was held that such a contract relation was under the protection of the Constitution of the United States, Mr. Justice Swayne, stating on page 10, "It would be a novel and startling doctrine to all these classes of persons that the government might discard them at pleasure because their respective employments were public offices and hence without the protection of contract rights." Thus assuring to them not only all the rights accorded to public officials, but all the rights they were entitled to by virtue of an ordinary contract of employment. These decisions do not contract but enlarge the rights of professors. In the case of *Rowland* v. *Mayor,* 83 N. Y. 376, Danforth, Judge, says, "Whether we look into the dictionary of our language, the terms of politics, or the diction of common life, we find that whoever has a public charge or employment or even a particular employment affecting the public is said to hold or be in office." The intent of the statute and the language used determine the character of the employment and where the legislature designates the employment as an office, the courts cannot otherwise construe it. In the case of *Dartmouth College* v. *Woodward,* 4 Wheaton 583, Mr. Webster states the law to be, "The professors are not necessarily members of the corporation; but they are apointed by the trustees, are removable only by them, and have fixed salaries payable out of the general funds of the college. Both president and professors have *free holds* in their offices, subject only to be removed by the trustees as their legal visitors for good cause. All the authorities speak of fellowships in colleges as *free holds* notwithstanding the fellows may be liable to be suspended, or removed for misbehavior by their constituted visitors."

"No description of private property has been regarded as more sacred than college livings. They are the estates and freeholds of a most deserving class of men; of scholars who have consented to forego the advantages of professional and public employments, and to devote themselves to sciences and literature and the instruction of youth in the quiet retreats of academic life." On page 634, Chief Justice Marshall says, "That education is an object of national concern and a proper subject of legislation all admit. That there may be an institution founded by government and placed entirely under its immediate control,

the officers of which would be public officers amenable exclusively to government none will deny."

The West Virginia University is a public institution, endowed by the Federal government and supported by State and National appropriations. Its regents are public officers in the strictest sense. Its professors are officers of the university, engaged in discharging the duty of education towards the youth of the State which the public has assumed. *Trustees* v. *Winston,* S. & P. Rpts. (Ala.) 17; *Dart* v. *Houston,* 22 Ga. 506. In the case of the *Regents* v. *Mudge,* 21 Kansas 229, the court says: "While the legislature unquestionably intended to confer upon the board of regents extensive powers, yet it did not intend to confer upon them the irresponsible power of trifling with other men's rights with impunity." The legislature of this State empowered the regents to appoint professors for an indefinite period of time, and to remove them for good cause. So that each professor on his appointment becomes vested with a freehold or vested right in his position or office, public or *quasi public,* and entitled to discharge the duties and receive the salary thereof until removed therefrom for good cause. For bad or no cause he cannot be deprived of his position, for the law determines his right otherwise. Hence, to deprive him of his position, good cause must be ascertained and determined. This must be done by the regents, and is judicial in its nature, as it amounts to a judgment, an ouster from office, and the deprivation of a vested right. In the case of *Murdock v. Trustees,* 12 Pickering 244, it was held that a removal of a professor by the trustees is a judicial proceeding, and in order to render it legal and binding on him, there must be substantially: 1. A motion or citation to him to appear; 2, a charge against him to which he is to answer; 3, a competent time assigned for proofs and answers; 4, liberty of counsel to defend his cause and except against the proofs and witnesses; and 5, a solemn sentence after hearing the proofs and answers.

In the case of *Gill* v. *Watertown,* 9 Wis. 254, it was held, "The common council of the city of Watertown do not possess the power to remove the superintendent of schools at discretion. A power in the council to remove for "due cause," is not a power to remove at discretion; but they must have a legal cause of removal, and their decision will be controlled by *mandamus.*" "Where a power to remove 'for due cause' is given to inferior officers and tribunals the words 'for due cause' operate as a limi-

tation on the power." "What is 'due cause' for the removal of an officer is a question of law, to be determined by the judicial department, and in the absence of any statutory provision as to what shall constitute such cause, it must be determined with reference to the nature and character of the office and the qualifications requisite to fill it." "If the power to determine finally what was 'due cause' were given to the same body vested with the power of removal, the limitation would be entirely defeated, and the power of removal absolute."

*Heath* v. *Johnson,* 36 W. Va. 783, determines that a school teacher in the public schools is not such a public officer as can be compelled by *mandamus* to perform duties that devolve upon superior public officers. It is true that it is said that the teacher is an employe and his duties an employment. All officers are employes and their duties employment. A public school teacher has all the attributes of a public officer, except he is not required to take the constitutional oath of office. He is, however, a public agent, charged with performing duties toward the State, and its children, that the State has assumed upon itself for the preservation and perpetuation of a republican form of government. Therefore public school teachers in all cases where proper to do so must be treated as *quasi public* officers, or agents. They have not a mere contractual relation with the trustees which will permit such trustees to dissolve the relation at any time and force them to their action for damages, but they are entitled to serve the full period of their employment unless for good cause shown, as any other public officer is permitted to do, and if wrongfully removed they may be restored to their positions by *mandamus.* In the case of *Kate Stanley* v. *Van Siclen,* 43 Hun. (N. Y.) 537, the plaintiff was by *mandamus* restored to a position in the public schools from which she had been unlawfully removed without cause for the reason that the trustees under their by-laws considered that her services could be dispensed with. As heretofore seen *mandamus* cannot be used to restore a mere discharged employe to his service, but he will be left to his remedy by action for damages. But it can be used to restore a public officer or *quasi-officer* to his position when the title to such position is not in controversy. In the case of *Kennedy* v. *Board of Education,* 82 Cal. 483, it was held that "*Mandamus* is the proper remedy to restore a teacher in the public schools to a right given by express law from which he is unlawfully precluded." The judge in

commenting on the law says: "The section does not provide for
any contract to be made by the board, but does provide in plain
and unequivocal terms that 'when elected,' the teacher 'shall be
dismissed only for violation of the rules of the board of educa-
tion or for incompetency, unprofessional or immoral conduct.' It
is clear to our minds that it was the intention of this section to
provide for just what is mentioned in it, an election of a
teacher, and not an employment by a formal contract fixing the
term of such employment. But it is unnecessary to hold in this
case that the board had not the power to limit the term of ser-
vice by an express contract. It is enough to say that this was
not done in this instance. She was elected precisely as pro-
vided in this section without limitation as to time. The respon-
dent having been elected in this way, the power of the board of
education to remove her is expressly and plainly limited by the
section last referred to. A teacher so elected 'shall be dismissed
only' for the causes named in the section. It seems to us that
nothing could be plainer than this. It is only the apparent or
possible effect of such a provision that seems to call for any hesi-
tation in giving the section its proper construction. It is said
with an apparent fear of disastrous consequences to our free in-
stitutions that such a construction confers upon the teachers of
our public schools life positions. But it does not confer a life
position. It gives the teacher a right to hold the position so long
as he is competent and faithful. When he ceases to be either his
removal is easy, the means by which it may be accomplished are
amply provided for, and the board of education has the matter
fully within its control. Are any serious consequences likely to
result from such a status? Why should the length of service of
a competent and faithful teacher in our public schools be left to
the arbitrary will of the board of education, and subject to the
varying personal and it may be political interests of its chang-
ing members. In our judgment there are none. We think the
clause in this section of the statute was intended to prevent just
such results and their consequences, and that it should not be
construed out of existence because of a fear that the positions
held by teachers may be made perpetual." Almost every word
of this reasoning is applicable to the present case. Notwith-
standing the teacher had been deprived of her place for more
than one year and another had been appointed to fill it, and she

had been assigned to a lower position, she was restored by *mandamus* to her former position.

Under the express provisions of the statute the Board of Regents establishes professorships which are to be permanent, and fix the salaries thereof, and then appoint suitable persons to fill the same for an indefinite period, depending on competency, faithfulness and the needs of the institution. These the statute positively forbids them to remove without good cause. It is not a contract as to extent of term with the board of regents, such as a breach thereof could be fully compensated in an action of damages. But the statute fixes the extent of the term indefinitely, and limits the power of the board to make removals. This is for the wise purpose of securing for the institution competent instructors and preserving them to it when so secured, thus placing them beyond the arbitrary control of an ever changing board tempted to seek places for friends at the expense of and to the great detriment of the institution. "No man of spirit, of self respect and of capability would accept an office unless he felt he was reasonably certain to hold the same for some reasonable period of time free from the mere whim or caprice of a body of men with unlimited power. The shorter and more precarious the tenure of office, the less attractive, important and valuable it would be, and generally men of only inferior talent could be found to accept it or perform its functions with such a precarious tenure." *Regents* v. *Mudge,* 21 Kan. 230. An efficient instructor even more than a good judge becomes more efficient the longer he is retained, and more valuable to the institution and the public, adding by his reputation and increasing knowledge to the success and prosperity of the one and fully compensating the other, for its outlay and contribution of funds. While a professor who is kept in trepidation continually through fear that some one may secretly and maliciously induce his removal without cause by the board is rendered unfit to properly perform the duties of his position and loses all love for the institution and all desire for its success. The institution which is continually changing its professors without cause other than political or personal, is bound to prove a failure. While the institution that retains and honors its competent professors will in turn be loved, honored and grow prosperous by and through them. Its reputation will be their reputation, and its glory will be their glory. Such has been the history of the great colleges of the old and such

must be the history of the great colleges of the new world. From the past we can always get examples of truth and justice. In the case of the *King* v. *University,* 1 Strange 566, the judge says: "Besides, the objection for want of notice can never be got over. The laws of God and man both give the party an opportunity to make his defense if he has any. I remember to have heard it observed by a very learned man on such an occasion that even God himself did not pass sentence upon Adam before he was called upon to make his defense." Yet the Board of Regents of the West Virginia University as now constituted do not hesitate to rob a faithful servant of his reputation by vague intimations and deprive him of his position by secret condemnation without giving him notice or allowing him to plead in his own behalf. But not satisfied with this they add insult to injury by informing him that while they cannot remove him immediately, that his services are valueless to them, and they have no further use for them, although they are legally bound to pay for them until his removal can take effect. It is well that the legislature in its wisdom has limited the power of the regents or such gross wrongs would be remediless and to be a West Virginian would be a crime punishable by expulsion from the offices of the university. The legislature has the right to determine and fix the term of service of the professors in the university, and in what manner and for what causes they may be removed, and having done so the Board of Regents are without authority to amend, repeal or alter such legislative provisions by by-law, rule or regulation of their own. If the legislature recognizes them as *quasi-public* officers and declares that they shall not be removed except for good cause, the Board of Regents may not otherwise remove them. They are not a law unto themselves. Good cause means some cause affecting the interest and well being of the university and never can be determined except by judicial hearing and investigation after due notice to the party whose reputation and legal rights are involved. To say that the board may determine arbitrarily what is good cause without judicial investigation is to make the statute of no effect and substitute the will of the board for the express enactment of the legislature. *Gill* v. *Watertown,* 9 Wis. 254.

Respondents claim that among the rules and regulations of said regents there is the following provision: "If any member of this faculty wishes to dissolve his connection with the uni-

versity, he shall give sixty days' notice to the Board of Regents
through the president of the Board of Regents or the president
of the university, and he shall be entitled to a like notice from
the Board of Regents." "Professors, instructors and teachers
shall continue in office until their death, resignation, or removal
by the Board of Regents." Respondents further claim that "the
relationship between the professors, instructors, janitors, and all
other employes and subordinates of said university are mere mat-
ters of contract for hire and subject to be terminated by either
party at pleasure, except as restricted by said provision in rule 7,
which provision has no reference to removal for good cause." If
this be true, then rule 7 is violative of the enactment of the leg-
islature, and is therefore void. While the Board of Regents may
make such ordinance, rule or regulation as is proper, so far as
the president and other employes of the university, except the
professors, are concerned, it can make no regulation or rule which
will permit them to remove such professors except for good cause.
Angell & Ames' Corporations, s. 332; *District* v. *Hall,* 15 Col.
367; *Tripp* v. *District,* 50 Wis. 651; *Frazier* v. *District,* 24 Mo.
Appl. 250; *Filler* v. *Town of Davis,* cited; *Savage* v. *Association,*
45 W. Va. 275; *Stanley* v. *Van Siclen,* cited; *Commonwealth* v.
*Railroad,* 27 Pa. St. 339. The regents can only adopt such rules,
regulations and by-laws as are not inconsistent with the laws of
the State and the United States, including the charter of the
university. Hence in attempting to provide rules for the removal
of professors contrary to the statute the regents exceed their
limited powers. All the regular employes of the university ap-
pointed at a fixed salary are officers thereof, yet the statute sep-
arates out and makes the professors a distinct class who may not
be removed except for good cause. In the attempted removal of
Dr. Hartigan, the Board of Regents violated its own rule for
sixty days' notice before removal is contemplated, and not sixty
days after removal. To relieve him from duty and pay him his
salary after the order of removal is entered is not a substantial
compliance with the rule, but is a direct breach thereof. If this
rule permits this to be done without good cause being shown, it
is to this extent void. Why cannot men, Christian men, deal
openly and honestly with each other? 5 Am. & En. En. Law
(2 Ed.), 95.

The board after the removal of Dr. Hartigan proceeded to con-
solidate his chair by a manipulation of names with the chair held

by Dr. J. L. McGill, and they insist that they had the right to do this and attempt to use the same as a further ground for the removal of the incumbent. This is apparently an after-thought for the purpose of evading the consequences of the illegal removal of Dr. Hartigan. The statute does not authorize the Board of Regents to abolish any of the professorships established by it, yet in a proper case as a necessary incidental power, when demanded, they would have the right to do so, but where there is an incumbent in such chair, and the abolishment of it would work his removal under the requirements of the statute, they should give him an opportunity to show cause against the same, as such abolishment, if necessary for the interests of the university would be good cause for removal. But such incidental power cannot be used designedly for the purpose of evading the statute, as has been apparently done in this case, otherwise the board could thus entirely destroy the statute. To-day it could abolish all professorships, and change their names, and to-morrow it could resuscitate them again and restore their names with a different set of incumbents. All incidental powers must be exercised in such manner as is consistent with the statutory limitations upon the powers of the board. If the statute had conferred on the board the authority to abolish a professorship without regard to the rights of the incumbent, then the rule established in the case of *Bracken* v. *W. & M. College,* 3 Call 573, might be in point. But such authority cannot be implied to oust vested rights without due process of law, and in violation of the express provisions of the statute. *Kennard* v. *Louisiana,* 92 U. S. 480; *ex parte Wall,* 107 U. S. 265. In the case of *Swinburne* v. *Albany Med. College,* 10 Abb. New Cases, the supreme court of New York held that the trustees could not abolish a chair for the purpose of removing the incumbent. That such a subterfuge would not be tolerated by the courts, and the trustees would not be permitted to do indirectly what they could not do directly.

There is no reasonable or legal excuse offered for the failure of the Board of Regents to afford Dr. Hartigan notice and hearing before his condemnation and removal. Nor can there be any loss or detriment to the university in their yet doing so, but it will rather redound to its honor and integrity. To be in accord with the free republican institutions of this country the university should be governed by law and not by the arbitrary and despotic will of a single or number of individuals moved by

whimsical and capricious notions. Under the statute this good
cause when ascertained must be communicated in writing to the
governor. This duty the governor may require the regents to
faithfully perform under penalty of removal from office. It is
not possible that this provision can be complied with by the com-
munication of slanderous falsehoods without investigation to
the governor. The law plainly implies judicial investigation and
a judicial conclusion, which cannot be had without notice and an
opportunity of defense afforded the accused. To condemn with-
out a hearing is vicious and barbarous and contrary to the law
of the land.

The conclusion therefore being inevitable that a professor in
the university as to his term of office and removal therefrom is
made by the provisions of the statute a *quasi-public* officer only
removable for good cause by a finding of the Board of Regents
concurred in by a majority thereof, it follows as a matter of
course that such power of removal is judicial in its nature and is
subject to review and control by the courts as higher supervis-
ing tribunals. Mechem's Public Officers, ss. 455, 456; *Fleming*
v. *Commissioners,* 31 W. Va. 619. As long as the regents act
within and do not abuse their jurisdictional powers *certiorari* is
the proper remedy to review and correct their errors. Code,
chapter 110, section 2. When the order of the board is in excess
and abuse of its powers so as to render it *coram non judice* and
void, *mandamus* will lie to compel restoration to office or other
position, although filled by another incumbent, as the subsequent
appointment by virtue of the order of removal being void, is held
to be void also. *King* v. *University,* 1 Strange 557; *Rex* v. *Balli-
nos,* 1 Strange ——; *King* v. *Bishop of Ely,* Dumford & Eaats'
Reports 290; *Gill* v. *Watertown,* 9 Wis. 254; *Kennedy* v. *Board
of Education,* 82 Cal. 483; *Fuller* v. *School,* 6 Conn. 532; *Stan-
ley* v. *Van Siclen,* 50 N. Y. Supreme Court Reports 537.

When the order of the board is in abuse or excess of their
jurisdiction prohibition lies as a matter of right before the order
has been fully consummated or carried into final execution. Code,
chapter 110, section 1; *Fleming* v. *Com's.,* 31 W. Va. 619. In
the case of *Brazie* v. *County Com's.,* 25 W. Va., it was held by this
Court that "The writ of prohibition lies from a superior court
not only to inferior judicial tribunals, but to inferior *ministerial*
tribunals possessing incidentally judicial powers and known as
*quasi-judicial* tribunals, and also in extreme cases to purely

ministerial bodies when they usurp and attempt to exercise judi-, cial functions." On page 219 JUDGE GREEN quotes approvingly from the case of *State* v. *Slackhouse,* 14 S. C. 417, the following language with regard to the use of the writ of prohibition: "Nor has it been confined entirely to inferior judicial tribunals as seemed at first to be intended; on the contrary it has been extended to other public functionaries, officials and persons charged with the performance of a duty not wholly judicial and not even very extensively or strongly marked with a judicial character." *State* v. *Commissioners of Roads,* 1 Mills Const. 55; *State ex rel.* v. *Simons,* 2 Spears 761. In Mechem on Public Officers, s. 101, it is said the writ lies only to prevent the unauthorized exercise by courts and officers of judicial powers whether the respondent is sitting as a judge in regularly established courts or not. The plain purpose of the writ is to prevent the abuse of judicial powers of *quasi judicial* powers by any officer, board or tribunal on whom the law has conferred the same. In the present case the law has conferred upon the regents the power to remove the professors of the university for good cause, which cannot be done until they judicially ascertain that good cause exists after the notice and hearing. An ascertainment otherwise or to act without such ascertainment is *coram non judice,* and void, and is plainly an abuse on the part of the board of its legitimate powers It removes without cause when it can only remove with good cause ascertained and determined after judicial investigation. *Rex* v. *University,* 1 Strange 567; *Bragg's Case,* 11 Coke 99; *Morley* v. *Power,* 5 Lea (Tenn.) 701; *Morley* v. *Power,* 10 Lea (Tenn.) 219; *Dist.* v. *Hall,* 15 Col. 367; *Finch* v. *Cleveland,* 10 Barb. 290; *Whitehead* v. *North,* 25 Pa. St. 418; *Stanley* v. *Van Siclen,* 43 Hun. (N. Y.) 537; *Kennedy* v. *Board of Education,* 82 Cal. 483; *Fuller* v. *School,* 6 Conn. 532; *Murdock* v. *Trustees,* 12 Pick. 244; *Gill* v. *Watertown,* 9 Wis. 254. And in Bailey on Jurisdiction, s, 451, p. 673, the law is stated thus: "Hence, when the power to remove from office by such a body is not discretionary, but only for cause, the proceedings are judicial in their nature, and may be reviewed by *certiorari;* and if the board or body proceed summarily, or in a manner not authorized by law to remove an incumbent from office, it may be restrained by writ of prohibition." *Statt* v. *Common Council,* 55 N. W. Rep. 118; *Speed* v. *Common Council,* 98 Mich. 360. In the case of *People* v. *Cooper,* 57 How. 417, it was held that the power to remove

officials after opportunity to be heard was judicial in its nature and that prohibition was the proper remedy to prevent a court or officer from the non-jurisdictional exercise or abuse of such power. The mayor was prohibited from removing an officer without authority of law. *Arkle* v. *Com's.,* 41 W. Va. 471. "The writ will be granted even after judgment or sentence to prevent execution." 16 Ency. Plead. and Practice, 1132; *Charleston* v. *Beller,* 45 W. Va. 44; *N. & W. R. R. Co.* v. *Pinnacle Coal Co.,* 44 W. Va. 574; *Wilkinson* v. *Hoke,* 39 W. Va. 559; *Bodley* v. *Archibald,* 33 W. Va. 229; *Manufacturing Co.* v. *Carroll,* 30 W. Va. 532; *West* v. *Ferguson,* 16 Grat. 270. "While it is not the office of the writ to annul orders or judgments and it cannot afford relief against an act already done, yet if the action of the lower court is only partially but not fully completed, the writ checks further proceedings, and if necessary to afford full relief quashes what has already been done beyond or in excess of jurisdiction. 16 Ency. Pleading and Practice, 1141; *Havmeyer* v. *Superior Court,* 84 Cal. 327; *State* v. *Elkins,* 130 Mo. 90; *People* v. *House,* 4 Utah 369."

"The writ lies to prohibit proceedings where the court undertakes to adjudge the rights of persons who have not been made parties thereto by the service of process." 16 Ency. Pleading & Practice, 1113. To attempt to adjudicate the rights of a person without notice to him is an excess or abuse of legitimate powers which will be restrained by prohibition. High Extra Rem., s. 767; *Yakima* v. *Superior Court,* 4 Wash. 655; *Stupatrick Manufacturing Co.* v. *Superior Court,* 123 Cal. 290; *People* v. *Fitzgerald,* 15 N. Y. App. Div. 539; *People* v. *Judge,* 26 Mich. 100; *Howard* v. *Pierce,* 38 Mo. 296; *State* v. *Mitchell,* 2 Bailey L. (S. Car.) 225; *State* v. *Superior Court,* 15 Wash. 500; *State* v. *Judge,* 37 La. 285. In the case of *The London and North Western Railway Co.* v. *Railway Com's. and others,* 1 Exchequer Div., 5 vol., p. 1, a writ of prohibition was awarded to prevent the enforcement of an order made by the railway commissioners fixing a uniform rate of traffic for the reason that the London and North Western Railway Company was not notified, and was not represented before the commissioners when such order was made. In this case there was no notice and no hearing but a condemnation and judgment *ex parte* depriving the petitioner of a vested statutory right, which judgment was not to take effect and could not be consummated or finally executed until

the first day of March, 1901. Hence it is a clear case of abuse of judicial authority calling for the writ of prohibition. It is insisted in argument that as the judge of the circuit court had entered an *ex parte* order refusing a rule, the only remedy was by writ of error and not by original application to this Court. This question was settled as to *mandamus* in the case of *Martin v. Board of Education,* 42 W. Va. 514. The same rule applies to prohibition. Three of the regents did not join in, but opposed and protested against the illegal action of the majority. So long as the majority did not exceed or abuse their corporate jurisdiction or powers, their action is entitled to be regarded as the action of the board but when the majority wilfully abuse their corporate authority, it is no longer the action of the board, but may be regarded as the action of the individual members joining in it and using their legal powers for illegal purposes, and the consequences of their illegal action should fall upon such individual members, and not on the corporation they represent. For instance, the costs and damages of this proceeding should not be adjudged against the board as such, and paid out of the corporate funds, but they should be borne by those whose illegal conduct made them necessary. It is not proper to tax costs against judges in prohibition cases unless they show a partizan interest but it is otherwise with inferior tribunals, especially when they exceed or abuse their jurisdictions. *People* v. *House,* 4 Utah 369; *Evans* v. *Thomas,* 32 Kan. 469; *Burtgof* v. *Bentley,* 27 Oregon 268; *State* v. *Berg,* 76 Mo. 136; 13 Ency. Pleading & Practice, 820.

Being firmly convinced that the foregoing syllabus and opinion correctly propound the law, and that the petitioner has been deprived of a vested statutory right contractual or *quasi-official* in his professorship to the injury of his living and professional reputation without due process of law contrary to the statute, the constitution of this State, the constitution of the United States and the former decisions of this Court, and that the refusal to award the writ is a plain and palpable denial of the equal protection of the laws, I hereby enter my solemn protest against the same. The following cases show the necessity of due process of law: *Moore* v. *Strickling,* 46 W. Va. 515, 519; *Arkle* v. *Board Com's.,* 41 W. Va. 471; *Dullam* v. *Wilson,* 53 Mich. 392; *People* v. *Therrien,* 80 Mich. 187; *People* v. *Stuart,* 74 Mich. 411; *Andrew* v. *King,* 77 Maine 231; *State* v. *Seay,* 64 Mo. 89; *State* v.

*St. Louis,* 70 Mo. 19; *Hallgreen* v. *Campbell,* 46 N. W. 381; *Ham* v. *Board of Police,* 142 Mass. 90; *State* v. *Harrison,* 113 Ind. 434; *State* v. *Duluth,* 53 Minn. 238; *State* v. *Smith,* 35 Neb. 13; *Ayers* v. *Newark,* 49 N. J. L. 170. Two propositions are fully recognized and established by all the authorities. *First,* that no person can have such absolute property in an office that he may not be dispossessed thereof according to law. *Second,* that an incumbent can have such legal right to the enjoyment of an office that he may not be deprived thereof, except by due process of law. The real difference between the authorities appears to be as to what constitutes due process of law. A respectable minority hold that removal from office is purely an administrative function constituting due process of law which is not reviewable by the judiciary. While the vast and decided weight of authority, sustained by reason and the fundamental principles of justice and private rights, hold that removal from office for cause is a judicial function requiring notice and hearing and reviewable in all proper cases by the courts. Heretofore this Court has adhered strictly to the latter proposition. Now an abandonment is proposed from certainty and right to uncertainty and wrong. From this I dissent.

For reasons known only to themselves my associates denied me knowledge and inspection of their opinion and syllabus until after it was handed down or became public property. This is a matter of judicial courtesy or ethics, and as a learned judge has said that courtesy is a mere matter of taste about which there is no disputing and from which there is no appeal since duelling has been abolished, every judge has the right to treat his confreres as he sees proper according to his inward consciousness and outward experience. Not having been admitted to their exclusive consultations over, nor been made aware of their written conclusions until after given to the public, I deem it my duty to review these conclusions, as some of them appcear to me to be plainly violative of the true principles of law and justice, and the opinion as a whole to be evasive, inconclusive and unsatisfactory as an exposition of sound law, although an admirable paper for other purposes. It asserts that the University belongs to the executive department of the state government with which the courts have no right to interfere; that a professor is not an officer, and therefore has no rights under constitutional or statutory law which the courts may protect, and, if an officer, that there

are many decisions which hold that officers may be removed without notice or hearing. These decisions are then quoted and commented on as authority, although they have been rejected long since by the best authorities, both courts and text-writers, including this Court. *Arkle* v. *Commissioners,* cited. Of these decisions Judge Champlin in the leading case of *Dullam* v. *Willon,* 53 Mich. 407, says: "I have examined carefully the authorities cited in the brief of the learned counsel for relator in support of the position that no notice is required to be given and that the action of the executive is final and conclusive. It is sufficient to say without commenting specially upon them that the reasoning of those cases does not commend itself to my judgment. They appear to be opposed not only to the decided weight of authority, but also to the fundamental principles of justice." The same language is perfectly applicable to the opinion of the majority in the present case, for it is certainly opposed to the deciding weight of authority and also to the fundamental principles of justice.

The case of *Dullam* v. *Wilson,* cited, furnished a complete refutation to the material points in the opinion under consideration too plain to be misunderstood and with argument thorough, convincing and unanswerable.

The subject of controversy was the power of the governor of the State to remove a trustee of the Deaf and Dumb Asylum without notice and hearing. The court took jurisdiction on the grounds that the power of removal from office was a judicial function and subject to review of the court without regard to the officer, court or board on whom the power was conferred.

Judge Campbell in his able, convincing and concurring opinion, on page 409, says: "It is further insisted that it is not within the power of the judiciary to review or sit in judgment upon the action of the executive, which must be respected as the act of an independent co-ordinate department of the government, subject to no appeal."

It is undoubtedly true that no court can review the lawful discretion of any body that is not a court and that the executive stands in this respect on the same footing with all other persons and bodies. But it is equally true that private rights cannot be subjected by legislative, executive or any other authority to the unregulated discretion of anyone. *Legal rights can only be*

*divested by such measures as are classed under the laws of the
land as due process of law.*

Courts in determining whether rights exist, or whether vested
rights have ceased to exist do not act necessarily or usually as
appellate tribunals whose judgments operate on the tribunals
or persons whose invasions of right are complained of. They
may or may not do so. But in a constitutional government the
action of all persons, official or private, which is in violation of
the constitutional rights, is simply null and void and usually
needs no reversal. And the action of any department of govern-
ment, whether legislative, executive or judicial beyond its juris-
diction or against the constitutional limits of its authority is in
law the same as if there had been no action and cannot be re-
garded as having legal effect. * * *

No executive authority exists outside of the legal boundaries.
All offices must be created in accordance with law. Unless they
are held during the pleasure of the executive or subject to re-
moval at his will he cannot interfere with them except as the
law provides, and if this right depend on conditions those con-
ditions must be determined in some legal way. No right can
be subject to his uncontrolled discretion. And where as is some-
times the case he has the duty of inquiry and decision he has no
power to decide without a hearing any controversy involving pri-
vate rights."

The decision is thus made to turn on the question as to whether
the person complaining had a vested right to exercise the office
until he was deprived thereof by due process of law.

It was not a question as to whether his position was a public
office, but it was a question as to his personal and private right
to eercise the same. Some of the authorities relied on were not
concerning public offices but school teachers, fellows in colleges
and divines or clergymen. And it is settled law that the officers
of both public and private corporation cannot be removed from
their offices illegally or without due process of law and if so
removed they can be restored to their position by *mandamus.*
Angell & Ames on Corporations, chap. 20, *Ohio* v. *Bryce,* 7 Ohio,
414. An attorney at law in the case of Morness, 39 Wis. 509,
was held to be a *quasi* public officer. Meehan on public officers,
s. 29. In the case of *ex parte* Garland, 4 Wall, 333, it was held
that an attorney at law "could not be deprived of his office ex-

cept by judicial ascertainment after notice and opportunity to be heard had been afforded."

The question, therefore, presented to the Court is not whether a professorship is a public office, but whether being in the nature of a public office the legally invested incumbent thereof has such a right therein that he is entitled to perform the duties and enjoy the salary thereto attached until he has been divested thereof by due process of law. He is undoubtedly a public servant, performing duties for the public in the education of its sons and daughters for a fixed salary from the public treasury and more nearly a public officer in all respects than an attorney at law recognized to be a *quasi* public officer.

But whether his position is public or private if he has a vested right to enjoy the same and in which his means of living and professional reputation are involved, he cannot be devested thereof except by due process of law, which necessarily includes notice and hearing before condemnation or judicial investigation and judgment.

This question must be determined from the law authorizing the establishment of such professorships. The law provides for their establishment and then further provides that the incumbents may be removed from office for good cause by a majority of all the regents after due notice given to each one of them of the time, place and object of the meeting and further that they shall report to the governor any such removal with the reasons there for.

This law becomes part of the professor's appointment and controls the same whether it be regarded as an appointment or a strictly contractual relation and the regents cannot make any binding arrangements or contracts subversive thereof. If they do such arrangements or contracts are void and not binding on either the regent or the professor. *Head* v. *University,* 19 Wall 530.

The law says to the candidate, accept this professorship and you shall not be removed therefrom except for good cause ascertained and determined by a majority of the regents in which such majority concurs at a meeting of which all the regents have been given notice that its purpose is to remove such professor. Now it is claimed that such professorship is not strictly speaking a public office, that the words "for good cause" mean "at pleasure"

when taken together with the requirements of a report to the governor.

How such report required can change the meaning of these words from "good cause" to "at the pleasure," is certainly incomprehensible. This report is intended for a check on the regents for the good of the university and the public, but how it can enlarge their powers and take away the rights of the professor to hold the office until he has been legally removed it is impossible to perceive. It is virtually conceded that it the professorship could be called a public office, there would have to be notice and hearing, but because it is mere public service the construction of the words must be different. It cannot be denied that the legislature had the power to make these professorships *quasi* public offices in respect to the removal of the incumbents and the legislature did use the necessary language for this purpose, why then must it be construed to mean something else by the courts? Why should the words for "good cause" mean for "good cause" when applied to public officers and not mean "good cause" when applied to other public servants or agents? Why should they in one case limit the power of removal and in the other case mean absolutely nothing? Why in one case should they vest rights and in another case operate to devest them? Such construction as this is unreasonable and unjust and is an abomination in the sight of the people that cannot be too severely condemned. It is legislation by the court subversive of the powers of the legislature. It permits the State through its legislature to confer a right and after it has been accepted and becomes vested and the incumbents living and reputation are dependent thereon, to withdraw it to his great injury without redress. But it is said there is no procedure provided for ascertaining "good cause" and the board are the final judges as to what is "good cause." This argument is taken from the repudiated case of *Hoboken* v. *Greer*, 3 Butcher (N. J. L.) 265, which is entirely overruled by *Haight* v. *Love*, 39 N. J. Law, 14. When the legislature gives the right the law of the land furnishes the procedure, and while the regents may decide what is "good cause," such cause must be "just cause," and such determination as to the existence of such cause is reviewable by the proper judicial authoritie as it affects the personal rights of an individual. In the case of *Commonwealth* v. *Slifer*, 25 Penn. St. 23, Chief Justice Lewis answers just such an objection urged by saying,

"It is true that the executive is made the judge and that his 'opinion' or judgment is conclusive so far as relates to the question of removal. But that judgment is not to be pronounced without notice, without any charge or specification and without opportunity given to the officer to make his defense. The reputation and the right of the incumbent to the office for the term specified in his commission are involved and he has the right to hear the accusation and to be heard in his defense." *State* v. *St. Louis,* 20 Mo. 19.

The incumbent having accepted the professorship on the conditions named in the law, the State cannot break or depart from these conditions through any of its agencies except through repeal or amendment of the law, and this cannot be done unless the professorship is recognized to be a *quasi* public office, which the incumbent holds by appointment instead of by contract, which must be carried out in good faith and the legislature may not impair it to the injury or damage of the incumbent. *Hall* v. *Wisconsin,* 163 U. S. 5. The State may abolish any office created by it, but not so as to impair the obligation of a contract.

So whether we view a professorship as an office held by appointment or public service held by contract, the incumbent had a vested right therein affecting both his living and professional reputation, of which he could not be deprived except by due process of law. If it was a mere contractual relation the incumbent under the law was entitled to enjoy it until he was removed for "good cause," and as his damages are non-ascertainable because of the indefiniteness of the term he is entitled to have, his proposed illegal removal prohibited or to be restored by *mandamus* after the removal becomes effective. All departments of the state government are subject to both state and national constitutional inhibitions, preservative of individual rights and neither the executive, legislative or judicial departments or any of the agencies thereof may deprive any person of such rights without due process of law.

It is said, however, that the supreme court of the United States in the case of *Taylor* v. *Beckham,* 178 U. S. 548, has held, that no person can have such an interest in a state office as amounts to property within the meaning of the fourteenth amendment to the Federal Constitution. This decision does not go to this extent, but through fear that it might be so understood, four of the nine judges refused to concur therein as to this

proposition.   The decision as I understand it is that there can be no absolute right of property in any public office and that Taylor and Marshall had no vested rights in their respective offices as governor and lieutenant-governor, but were only occupying them provisionally until the true right of office was determined by the general assembly, which was made the final judge of this question by the constitution of the state and whose determination was conclusive and final and could not be reviewed either by the supreme court of the state or the supreme court of the United States.   It was the constitutional authority of the general assembly to finally say where the right of office was, and it having found against Taylor and Marshall, they had no vested right in the offices that came under the protection of the federal Constitution.   The supreme court limits its decision to the offices and the circumstances of the case.   It is not a general decision that applies to all public offices, state and national as is made clear in the dissenting opinions, for it is clearly shown by them that the former decisions of the court have established the contrary doctrine.   There is quite a difference between an original contest for office and removal therefrom.   In the former case the right or title of the office not yet vested is involved, while in the latter the title to the office is conceded and the incumbent is in full possession and enjoyment thereof and the proceedings seek to deprive him of a conceded vested right by reason of a legal forfeiture for some good cause, the establishment of which avoids his right to continue in its possession and enjoyment.   Nor is the question of state's rights involved in this controversy, but it is a question as to whether the state officers in dealing with private rights can be required to conform to the statute of their creation and the laws of the land, or can disregard all law while they remain in office and act according to their own arbitrary and uncontrolled wills as monarchs of all they survey, while none their rights dare dispute. According to the holding of two of the judges, at least, a majority of the board are a law unto themselves, not bound by the statute of their creation, but may wholly disregard its requirements to the injury and destruction of the rights of others, and their action in doing so is not reviewable in any manner by the courts.   .

It is hardly conceivable that men learned in law could arrive at such a conclusion in a government where law and not indi-

vidual will is always recognized as paramount and supreme. There is no doubt but that the legislature may change the law and abolish the professorship at pleasure, being in the nature of offices, but the board of regents must conform to the law as written, and if they do not the courts should compel them to do so.

The opinion further says, conceding the right of the petitioner to notice and hearing *certiorari* and not prohibition is the proper remedy. Such a proposition as this is certainly out of place from the mouth of a lawyer.

To say that a tribunal exercising judicial power and engaged in depriving a person of his legal rights without having jurisdiction of his person cannot be stopped by prohibition before it has consummated its illegitimate proceedings, and that the injured person must wait until the adjudication becomes final and his rights are gone, and then resort to *certiorari* is not only to fly in the face of the authorities, but of sound reason and good common sense. *Quimbo Apps.* v. *The People,* 20 N. Y. 540. In every case in which *certiorari* lies, prohibition lies, before the adjudication becomes consummated or finally executed, if the tribunal is exceeding or abusing its jurisdiction.

The Code, chapter 110, section 1, says, "A writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power when the inferior court has not jurisdiction of the subject matter in controversy, or having such jurisdiction exceed its legitimate power." Is it no excess of legitimate powers to deprive a person of his legal rights without due process of law? Is it no excess of legitimate powers to disobey the Constitution of the State and of the United States?

It has been held that these constitutional inhibitions apply to every agency of the state whether executive, legislative, or judicial. *Railroad Co.* v. *Chicago,* 166 U. S. 226. How then is it possible to say that any tribunal that violates them is not exceeding its legitimate powers? The legitimate powers of judicial tribunals over the rights of individuals is only to deprice them of these rights by due process of law and when they undertake to deprive them of these rights without such due process they are acting in excess and abuse of their legitimate powers. "No judgment of a court is due process of law if rendered without jurisdiction in the court *or without notice to the party.*" *Scott* v. *McNeal,* 154 U. S. 46. Nor is the Supreme Court of

the United States bound by the State court's construction of a state statute, when the question is as to whether such statute provides for such notice as is required to constitute due process of law. In every such case the Supreme Court of the United State must decide for itself the true construction of the statute. *Id.* 45. There is no question but that when any tribunal undertakes to decide the rights of any person in his absence and without notice that it exceeds and abuses its legitimate powers and although its judgment may be void for want of service, it may be prohibited from executing the same and the judgment may be vacated and annulled by this writ. In the 11 Ency. Pl. & Prac. 1113, this law is made so plain that a child could not misunderstand it.

It is true that *certiorari* or some other remedy hight also lie. Such remedies do not act promptly on the tribunal and stay its illegitimate exercise of power, but tend to continue litigation and are not adequate to stay abuse and prevent illegal injury that may otherwise be without redress. Not only this, but the statute says, that prohibition shall lie as a matter of right and it does not signify as to how many other remedies the person may have against whom illegitimate power is being exercised in direct violation of the supreme law of the land, he is absolutely entitled to the quick, speedy, and efficacious relief of the writ of prohibition. *N. & W. R. R. Co.* v. *Pinal Coal Co.* 44 W. Va. 574. The particular object of the writ is to stay the inferior tribunal within the bounds of its jurisdiction and when such inferior tribnual is openly violating both the Constitution of the United States and the constitution of the State it has certainly exceeded the bounds of its jurisdiction and when the law gives to the injured party this writ as a matter of right this Court in denying it to him is also in violation of that provision of the Fourteenth Amendment of the Constitution of the United States which secures to him the equal protection of the laws. Dr. Hartigan was secretly condemned and removed from his position without notice or hearing and thereby his living was about to be taken away from him and his reputation permanently injured and an appeal to the highest state tribunal on unfounded pretexts the equal protection of the laws which should be afforded all its citizens, is denied him. His relief must be found beyond the borders of the State.

Our government is said to be a government of law. All our

laws, the decisions of the courts, the acts of all officers, including the professors of the University are considered but the positive expressions of the will of the people, and these laws, these acts and these decisions should correspond with that will. Certainly we can say that such is not invariably the case but the people are oftentimes deluded and deceived, for it is due to the frailty of human nature that offenses against that will must indeed come.

The charge has been made that I am moved by prejudice or through interest in the result in this case. The best evidence of prejudice or undue interest is the evasion or departure from the fundamental principles of law and justice as settled by the decisions of the courts and preserved by the text writers. A man's heart must be known by his works. In this opinion I have endeavored to adhere strictly to the fundamental principles of justice as settled and determined by the decided weight and preponderance of authority and have not attempted in any manner to evade, confuse or misinterpret the many decisions in relation to these principles. From the chaff that has accumulated from the careless work of incompetent and partisan judges I have sought to secure the true grains of wheat. The result of my effort must speak for itself. I confess that I have a deep and abiding interest in the Unitersity and its success and long to see the day come when it will be placed by law beyond the power of those who arbitrarily seek to manipulate it for private gain or ambition instead of the public good and when the thousands of young men and women who annually go beyond the State for educational facilities will find their desires fully satisfied within its gates. There is not a student in attendance at that institution to-day but who knows in spite of judicial sophistry that Dr. Hartigan, though his faults may be many, was unjustly treated and wrongfully removed and has been denied the equal protection of the laws.

The very first principles that should be taught there and thoroughly instilled in the minds of its sons and daughters both by precept and example are the true principles of justice guarded by truth, righteousness and law, and which may be summed up in one imperishable saying:

"Whatsoever ye would that men should do to you, do ye even so to them, for this is the law and the prophets."

"For with what measure ye mete, it shall be measured to you again."